# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT
_____

## No. 22-13945-B
_____


ELIE NEHME,

*Plaintiff-Appellant*,


vs.


FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES,

*Defendant-Appellee*.
_____

Appeal from the United States District Court,
Southern District of Florida

L.T. No.: 20-cv-24649-CANNON
_____

## APPELLANT'S REPLY BRIEF
_____

Roderick V. Hannah, Esq.
**RODERICK V. HANNAH, ESQ., P.A.**
*Counsel for Appellant*
4800 North Hiatus Road
Sunrise, Florida 33351-7919
Telephone: (954) 362-3800
Facsimile: (954) 362-3779
rhannah@rhannahlaw.com

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

ELIE NEHME,

   Appellant,

   vs.                                        CASE NO. 22-13945-B

FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES,

   Appellee.
_____/

## APPELLANT'S CERTIFICATE OF INTERESTED PARTIES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Appellant Elie Nehme hereby certifies that the following persons and entities may have an interest in the outcome of this case:

1. Florida International University Board of Trustees – Appellee

2. Roderick V. Hannah, Esq. – Appellant's current counsel

3. Roderick V. Hannah, Esq., P.A. – Appellant's current counsel

4. Oscar E. Marrero, Esq. – Appellee's prior counsel

5. Marrero & Wydler – Appellee's prior counsel

6. Wydler Law – Appellee's current counsel

7. Elie Nehme – Appellant

8. Lourdes E. Wydler, Esq. – Appellee's current counsel

9. Lauren C. Martin, Esq. – Appellee's current co-counsel

C-1 of 1

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .............................................C-1 of 1

TABLE OF CONTENTS ........................................................................ iii

TABLE OF CITATIONS ........................................................................iv

ARGUMENT ........................................................................................1

**I.     RECORD EVIDENCE WAS PRESENTED THAT NEHME WAS A QUALIFIED INDIVIDUAL WITH A DISABILITY WHEN HE WAS CALLED BEFORE THE MSEPC A THIRD TIME, WHICH WAS SOLELY BECAUSE OF HIS FAILURE OF THE PSYCHIATRY SHELF EXAM RETAKE AND THE PSYCHIATRY CLERKSHIP.** ...................................................1

**II.    THE RECORD EVIDENCE DEMONSTRATED THAT TRIABLE ISSUES OF MATERIAL FACT REMAINED AS TO NEHME'S FAILURE TO ACCOMMODATE AND WRONGFUL DISMISSAL CLAIMS.** …….……………………………………………………...13

*A. The record below demonstrated, and FIU even admitted, that the medical school failed to provide Plaintiff with the required testing accommodation of a minimal distraction room for his Psychiatry shelf exam retake.* ……………………………….………………….………13

*B.  There were genuine issues of material fact that FIU acted with deliberate indifference in both failing to accommodate Nehme for his Psychiatry exam retake and in ultimately dismissing him.* ……………...22

CONCLUSION ...................................................................................27

CERTIFICATE OF COMPLIANCE.......................................................28

CERTIFICATE OF SERVICE ..............................................................29

**Page Nos.**

*Bowens-Thomas v. Alabama Coop. Extension Sys.,*

    No. 2:16-CV-621-WKW, 2022 WL 617184,

    (M.D. Ala. Mar. 2, 2022)……………………………………....... 20

*Cooney v. Barry Sch. of Law*,

    720 F. Appx. 571 (11th Cir. 2018)…………………………………… 9

*Ellis v. Morehouse Sch. of Med.*,

    925 F. Supp. 1529 (N.D. Ga. 1996)……………………………….... 9, 10

*Forbes v. St. Thomas Univ., Inc.,*

    456 F. Appx. 809 (11th Cir. 2012)………………………………… 9, 21, 22

*Frank v. University of Toledo,*

    621 F. Supp. 2d 475 (N.D. Ohio 2007)………………………… 21

*Georgia Power Co. v. ABB, Inc.,*

    No. 4:17-CV-00125-HLM, 2019 WL 11505721

    (N.D. Ga. Feb. 27, 2019)…………………………………………. 19

*Goldberg v. Fla. Int'l Univ.*,

    838 F. Appx. 487 (11th Cir. 2020)………………………………… 7, 9

*Hoppe v. College of Notre Dame of Maryland*,

    835 F. Supp. 2d 26 (D. Md. 2011)……………………………….... 21

*J.A.M. v. Nova Southeastern University, Inc.,*

    646 Fed. Appx. 921 (11th Cir. 2016)………………………………….   9, 10

*Khan v. Midwestern Univ.*, 879 F.3d 838 (7th Cir. 2018),

    *as amended on denial of reh'g* (Feb. 26, 2018)……………………… 10, 11, 12

*Liese v. Indian River Cty. Hosp. Dist.*,

    701 F.3d 334 (11th Cir. 2012)…………………………………………….   25

*Martin v. Southern Illinois University School of Medicine*,

    No. 16–CV–3294, 2017 WL 4780613

    (C.D. Ill. Oct. 23, 2017)………………………………..…….………….   21

*Oser v. Capital University Law School*,

    2009 WL 2913919 (S.D. Ohio 2009)……………………………………   21

*Ray v. Ford Motor Co.,*

    No. 3:07CV175-WHA-TFM, 2011 WL 6749034

    (M.D. Ala. Dec. 23, 2011)………………………………………………..   19

*Segev v. Lynn Univ., Inc.*,

    No. 19-CV-81252-Cannon/Reinhart, 2021 WL 2269838

    (S.D. Fla. Feb. 6, 2021)…………………………………………………….   25

*Stewart v. Happy Herman's Cheshire Bridge, Inc.,*

    117 F.3d 1278 (11th Cir. 1997)………………………………………..   20

**Page Nos.**

*Williams v. Asplundh Tree Expert Co.*,

     No. 3:05-cv-479-J-33MCR, 2006 WL 2868923

     (M.D. Fla. Oct. 6, 2006)……………………………………………… 18, 19

*Zainulabeddin v. Univ. of S. Fla. Bd. of Trs.,*

     749 F. Appx. 776 (11th Cir. 2018)…………………………………. 7, 8, 9

*Zukle v. Regents of Univ. of California*,

     166 F.3d 1041 (9th Cir. 1999)……………………………………… 10, 11

**STATUTES, REGULATIONS, AND RULES**

**Page Nos.**

Federal Rule of Evidence 801……………………………………………… 19

**ARGUMENT**

**POINT I**

**RECORD EVIDENCE WAS PRESENTED THAT NEHME WAS A QUALIFIED INDIVIDUAL WITH A DISABILITY WHEN HE WAS CALLED BEFORE THE MSEPC A THIRD TIME, SOLELY BECAUSE OF HIS FAILURE OF THE PSYCHIATRY SHELF EXAM RETAKE AND PSYCHIATRY CLERKSHIP.**

As did the District Court below, Appellee Florida International University Board of Trustees ("FIU"), in is Answer Brief, engages in revisionist history to support its position that Appellant Elie Nehme ("Nehme") was not, as a matter of law, a qualified individual with a disability for purposes of his Americans with Disabilities Act ("ADA") claims. FIU relies almost exclusively for this conclusion on a provision in the medical school's Student Handbook that states: "failure of a clerkship *or* poor shelf exam performance [in Period 3], such as three shelf scores in the 5–10 percentile range, *may* also result in review by the MSEPC". (R. 55-7; emphasis supplied).[1] However, FIU presented no record evidence below that Nehme's referral to the MSEPC the third and final time, and his dismissal, was based on this Handbook provision or on any alleged "poor shelf exam" scores in

---

[1] References to the record shall be to Southern District docket entry number and paragraph and/or page numbers: (R. #, ¶ #, p. #).

the Period 3 clerkships he had passed.  Instead, the record evidence, which the District Judge ignored and FIU now sidesteps, demonstrated that Nehme had performed at an overall "competent" level as a medical student throughout his three years of medical school – including, notably, in each of the six third-year clerkships he passed -- up until his failure of the Psychiatry shelf exam retake and the Psychiatry clerkship. (R. 64 ¶ 20; R. 63-1 p. 218).  Moreover and most significantly, the record evidence demonstrated that it was the Psychiatry clerkship failure – not any purported "poor performance" on other shelf exam takes or retakes -- that was the *sole* trigger for Nehme being referred to the MSEPC a third and final time and then being dismissed. (R. 64 ¶ 44, R. 63-1 p. 7).

A reasonable inference thus could and should have been drawn in Nehme's favor that, had he passed the Psychiatry shelf exam retake and the clerkship, he would not have been referred to the MSEPC a third time and he would not have been dismissed from the medical school.  While the Handbook provision supports *speculation* that Nehme's low percentile scores on some of his clerkship shelf exams "*may*" have resulted in referral to the MSEPC, the undisputed *fact* is that Nehme's referral was solely because of his failure of the Psychiatry shelf exam retake for which he was not properly accommodated and which resulted in his failure of the Psychiatry clerkship.  Indeed, given that Nehme overall had

performed well in *all* his Period 3 clerkships up until the Psychiatry clerkship failure – receiving grades of 89 in Family Medicine, 88 in Surgery, 88 in Internal Medicine, 83 in Neurology, and 83 in OB/GYN  (R. 64 ¶ 20; R. 63-1 p. 218)[2] – a reasonable inference could be drawn in Nehme's favor that the medical school would not have referred him to the MSEPC based on his shelf exam scores in those other clerkships he passed.

The District Judge's decision below thus was based solely on speculation as to what could or might have happened per a permissive Handbook provision (that significantly did not mandate dismissal) instead of what in fact did happen, as supported by record evidence.  The District Judge thus erred in adopting as "undisputed" FIU's purely speculative position and in failing to view the facts and the reasonable inferences to be drawn therefrom in Nehme's favor in granting summary judgment to FIU.

Notably, FIU also plays fast and loose with the facts in recounting Nehme's academic history at the medical school to bolster its argument that Nehme was an overall "poor performing" student when Nehme had, in fact, been performing at an overall competent level when he failed the Psychiatry shelf exam retake due to not being properly accommodated.  Specifically, at page 17 of its Brief, FIU

---

[2] Nehme also received a "P" or "passing" grade in another clerkship – Radiology. (R. 63-1 p. 218).

incorrectly states, under the heading "Nehme Performs Poorly in Period 1", that Nehme failed his Genes, Molecules and Cells "course". However, it is undisputed that Nehme remediated the final exam and **passed** the course and **passed** all his other Period 1 courses without incident. Significantly, Nehme was able to accomplish this even with an as yet undiagnosed learning disability and without receiving any accommodations. Such performance by a first-year medical student – i.e., passing all his courses -- cannot fairly be characterized as "poor".

FIU similarly twists the facts as to Nehme's academic performance after his commencement, the first time, of Period 2. Specifically, FIU does not place in proper context Nehme's failures of the Cardiovascular and Respiratory Systems and the Systems Based Practice courses. While Nehme did initially fail Cardiovascular and Respiratory Systems by failing both the initial final exam and its retake, he was suffering at the time from his unaccommodated learning disability, which, following diagnoses by FIU's Medical Student Counseling and Wellness Center, resulted in Nehme being granted the two testing accommodations of "50% extra time on exams" and a "Minimal Distraction Testing Room". (R. 58 ¶¶ 3, 4).

As to Nehme next "course" failure -- Systems Based Practice – FIU conveniently fails to mention that there was record evidence that Nehme failed the final exam for that course without being properly accommodated, even though

FIU's Disability Resource Center ("DRC") already had directed that Nehme be provided the two testing accommodations. (R. 63-1 pp. 13, 47 (IDEA chart indicating that "Nehme did not receive accommodations for the final exam" for Systems Based Practice)). FIU also conveniently overlooks the fact that, because he was out of school on an approved medical leave of absence, Nehme never was permitted to retake the final exam for the course, even though it was medical school policy that all students were permitted, without limitation, to retake any first-time failed final exams. (R. 64 ¶ 15).

Nonetheless, FIU proceeds to mischaracterize Nehme's academic performance through Period 1 and his initial take of Period 2 by stating that "[d]uring Period 1 and his first attempt at Period 2, Nehme failed the equivalent of three *courses*: (1) Genes, Molecules and Cells; (2) Cardiovascular and Respiratory Systems; and (3) Cardiovascular and Respiratory Systems remediation." (Answer Brief p. 21; emphasis supplied). Instead, the record evidence is that Nehme remediated and *passed* the Genes, Molecules and Cells course. (R. 79 p. 4). In addition, the Cardiovascular and Respiratory Systems course and its final exam retake are not considered two separate courses but only a single course, which Nehme did fail but which he successfully passed when he retook all of Period 2. (*Id.*)

FIU also falsely states that Nehme failed the Systems Based Practice course "[a]fter requesting and ***receiving*** accommodations." (Answer Brief p. 21; emphasis supplied). However, as mentioned above, the record evidence is that Nehme was ***not*** properly accommodated for his one and only take of the Systems Based Practice final exam, which led to his failure of the exam and the course. (R. 63-1 pp. 13, 47; R. 64 ¶ 15).

FIU also unfairly mischaracterizes Nehme's Period 3 academic performance by focusing solely on the shelf exam scores, and not on how Nehme ultimately fared in his Period 3 clerkships. As supported by the record below and the District Judge ignored, Nehme actually did well overall in each of his six Period 3 clerkships until his failure of the Psychiatry shelf exam retake for which he was not properly accommodated. Nehme's transcript demonstrates that he received the following final grades in his Period 3 clerkships for which FIU now requests this Court to find, as a matter of law, that Nehme was "unqualified": 89 in Family Medicine, 88 in Surgery, 86 in Internal Medicine, 83 in Neurology, and 83 in OB/GYN, for an overall term GPA of 86.23, well within the "competency" range for a medical student. (R. 64 ¶ 20; R. 63-1 p. 218). Nehme's overall good grades in all his Period 3 clerkships, with the exception of Psychiatry, cannot and should not be overlooked when viewing the facts and evidence in Nehme's favor, and, at the very least, cannot and should not result in a finding that Nehme was not a

"qualified" individual with a disability as a matter of law whose case should be summarily dismissed.

All the cases that FIU cites in support of its arguments are factually and legally distinguishable. Unlike Nehme, the medical students in *Goldberg v. Florida Int'l Univ.*, 838 Fed. Appx. 487 (11th Cir. 2020), and *Zainulabeddin v. Univ. of S. Fla. Bd. of Trs.*, 749 Fed. Appx. 776 (11th Cir. 2018), were not dismissed from their medical schools because of any course failures for which the medical school had explicitly found, following an internal investigation, that the failures were because the schools had failed to provide required testing accommodations. Also, unlike Nehme, the plaintiff in *Goldberg* was called before the MSEPC and was dismissed when he failed *two* Period 3 clerkships, including failing a family medicine shelf exam and its retake for which he received his full accommodations for both. *Goldberg*, 838 Fed. Appx. at 490-91. The student in *Goldberg* also failed two of the three clerkships he had taken when he was called before the MSEPC and recommended for dismissal. *Id.* In contrast, Nehme passed all of his Period 3 clerkships – six in total and five with grades in the 80s evidencing overall competency – and failed only one clerkship, Psychiatry, as a result of his failure of the final exam retake where he was not provided with the required accommodation of minimal distraction room as FIU, through its Office of

Inclusion, Diversity, Equity, and Access ("IDEA"), explicitly found. (R. 64 ¶¶ 20, 45-46, 50; R. 63-1 pp. 37-40, 71-74, 218).

Similarly, in *Zainulabeddin,* the medical student, unlike Nehme, was dismissed after she was allowed to return to the medical school and then still failed two courses, even though she was given all her required testing accommodations for those courses. *Zainulabeddin*, 749 Fed. Appx. at 783. Significantly, unlike Nehme, the student in *Zainulabeddin* did not "clearly identify any deficiencies in the accommodations she received" after she was awarded the testing accommodations and still failed the courses, which the court found conclusive. *Id.* at 784 ("Because she ultimately failed two courses *even after receiving disability accommodations*, the Committee's subsequent dismissal decision cannot reasonably be attributed to discrimination." (emphasis supplied)). Here, in contrast, the record evidence established not only that Nehme was not given the required accommodation of a minimal distraction room that led to his Psychiatry retake exam failure and failure of the Psychiatry clerkship – which triggered the MSEPC hearing that resulted in his dismissal -- but that he also internally complained to FIU, through its IDEA, of the medical school's failure to accommodate and the IDEA repeatedly found that Nehme's complaint was "true" and "substantiated". (R. 64 ¶¶ 8, 23, 28, 42-46, 50).

Also, factually distinguishable are the other cases Defendant summarily cites in its Brief -- *Forbes v. St. Thomas University, Inc.*, 456 Fed. Appx. 809 (11th Cir. 2012); *Cooney v. Barry School of Law*, 720 Fed. Appx. 571 (11th Cir. 2018); *J.A.M. v. Nova Southeastern University, Inc.*, 646 Fed. Appx. 921 (11th Cir. 2016); and *Ellis v. Morehouse Sch. of Med.*, 925 F. Supp. 1529 (N.D. Ga. 1996). As with *Goldberg* and *Zainulabeddin*, none of these cases involved a situation, as here, where the student was dismissed from the school because of a course failure for which the school had admittedly failed to provide a required testing accommodation. The *Forbes* decision is also inapplicable in that it did not involve a student's dismissal from the school but her efforts to seek readmission after being dismissed from the school for not maintaining a required grade point average even with accommodations. *Forbes*, 456 Fed. Appx. at 812. Similarly, the student in *Cooney* failed to maintain a required GPA level for all his courses even after being provided all required accommodations, and the student handbook mandated the dismissal for failure to maintain the GPA. *Cooney*, 720 Fed. Appx. at 575. Nehme here, in contrast, had a cumulative GPA throughout his Period 2 completion and all his passed Period 3 clerkships of 82.62, representing overall competency as a medical student per the medical school's Handbook. The *J.A.M.* decision is also factually distinguishable as the plaintiff there, who suffered from alcoholism, was not dismissed for poor academic performance or for his disability but because he

indisputably breached his substance abuse and alcohol agreement with the university. *J.A.M.*, 646 Fed. Appx. at 927. In addition, the court found the plaintiff not "otherwise qualified" as his mental disability rendered "him wholly unable to participate in [the university's] osteopathic medicine program". *Id.* Nehme, in contrast, successfully completed Period 1 and advanced to Period 2 – even without any disability accommodations – successfully completed all of Period 2 with a term GPA of 84.27 evidencing overall competency, was promoted to Period 3, and successfully completed and passed six of the seven clerkships he took for Period 3 for a term GPA in Period 3 of 86.23, failing only the Psychiatry clerkship due to Defendant's admitted failure to accommodate him. (R. 64 ¶¶ 4, 5, 17, 45, 46; R. 63-1 p. 218). Finally, *Ellis* is distinguishable because the medical student there, unlike Nehme, did not fail the clinical course that triggered his dismissal because he had not received a required accommodation for his disability in taking a final exam. Instead, overwhelming evidence was presented that the student's failing grade in the course was justified because his professor had unanimously found his performance unsatisfactory. *Ellis*, 925 F. Supp. at 1543-44.

The two additional cases from other jurisdictions upon which FIU primarily relies for its argument that Nehme was not a "qualified" individual with a disability -- *Zukle v. Regents of Univ. of California*, 166 F.3d 1041 (9th Cir. 1999), and *Khan v. Midwestern Univ.,* 879 F.3d 838 (7th Cir. 2018), *as amended on denial of reh'g*

(Feb. 26, 2018) – are also factually and legally distinguishable from the instant case. Neither case involved a situation where, as here, the student was awarded specific accommodations for a diagnosed disability, had failed a critical final exam and course because of an admitted failure to provide a required accommodation, and the unaccommodated course failure had played a central role in the final dismissal decision. Unlike Nehme, the medical student in *Zukle* had argued that she would have passed certain failed courses if she had been given ***additional*** accommodations beyond those the school normally gave and which the school had viewed as unreasonable. In upholding summary judgment, the appellate court found that the additional accommodations the student had wanted were unreasonable. 166 F.3d at 1049. Furthermore, unlike the situation here, the medical school in *Zukle* had provided the student with its normal testing accommodations for learning disabled students yet the student still had failed her clerkships that led to her dismissal. Nehme, in contrast, failed only ***two*** courses after he was diagnosed by FIU with learning disabilities and was awarded testing accommodations – Systems Based Practice in his first take of Period 2 and the Psychiatry Clerkship in Period 3 – and the record evidence is that he was not provided his required accommodations for final exams (one initial take and one retake) in ***both*** of those courses.

As for the *Khan* case, the medical student had failed numerous courses and exams, and even withdrew from other courses, prior to becoming pregnant and suffering any pregnancy-related disabilities for which she eventually claimed she was being discriminated against. 879 F.3d at 842-43. Even after being given a "second chance" to repeat some first-year courses and passing them with "C's" that allowed her to move on to her second year, the student continued to fail numerous courses in her second year that led to her dismissal per the school's policies. *Id.* In contrast, Nehme, after being given his chance to repeat Period 2, passed ***all*** his Period 2 courses and final exams without needing any retakes, had accumulated an overall GPA of 81.27, and then successfully had moved on to his Period 3 clerkships. (R. 64 ¶¶ 17, 20, 45, 46; R. 63-1 p. 218). In Period 3, up until his Psychiatry shelf exam retake failure, Nehme had passed all his clerkships with good grades in the 80s, even raising his cumulative GPA to 82.62. (*Id.*). Nehme's academic situation compared to that of the dismissed student in *Khan* thus is a comparison of day to night.

The District Court erred when it overlooked the substantial and relevant record evidence, and the reasonable inferences to be drawn therefrom, that demonstrated Nehme was a "qualified" individual with a disability who was able to meet the medical school's academic standards up until the time he was not properly accommodated for the Psychiatry shelf exam retake. Per FIU's own

admissions through its IDEA, Nehme had not been properly accommodated for his Psychiatry shelf exam retake and thereby failed the retake and the clerkship, events that led directly to his being referred to the MSEPC and being dismissed from the medical school. As the Magistrate Judge correctly concluded below, summary judgment in favor of FIU should not have been granted, and it was reversible error for the District Court to do so.

## POINT II

**THE RECORD EVIDENCE DEMONSTRATED THAT TRIABLE ISSUES OF MATERIAL FACT REMAINED AS TO NEHME'S FAILURE TO ACCOMMODATE AND WRONGFUL DISMISSAL CLAIMS.**

**A.** *The record below demonstrated, and FIU even admitted, that the medical school failed to provide Plaintiff with the required testing accommodation of a minimal distraction room for his Psychiatry shelf exam retake.*

In its Answer Brief, FIU argues that FIU indisputably provided Nehme with the required reasonable accommodation of a minimal distraction room for his Psychiatry shelf exam retake, and cites to record evidence that: (1) Nehme was assigned a "private" conference room; (2) he sat for the retake exam alone; (3) the room where the exam was held was not located near general population classrooms; (4) Nehme was provided earplugs; (5) signage was placed outside of the testing room to be quiet; (6) Nehme was provided the allotted time and one-half to take the exam; and (7) Nehme was seated with his back to the frosted glass that faced a hallway. (Answer Brief pp. 32-33). However, FIU conveniently

ignores the substantial record evidence, recounted in his Initial Brief, that Nehme knowingly was placed in a room and testing environment where the constant distractions were anything but minimal.

Specifically, Nehme testified that Room AHC2 495 where he took the test had windows on both sides, was next to a busy hallway where administrative offices and OSCE simulation rooms were located and was close to the elevator. (R. 64 ¶ 42). Nehme further testified that, while he was seated with his back to the large, frosted window in the room, he could still see student faces and shapes passing in the hallway from his "periphery". (*Id.*). Nehme also testified that the movement of students in the hallway was constant throughout the exam and the people were walking, yelling, and talking outside the room. (*Id.*). He further testified that the constant noise and movement from the hallway caused him to lose focus and was very distracting, and that, ***even though he had earplugs in, he could still hear people talking and yelling outside***. (*Id.*). Nehme acknowledged that at some point a heater was brought into the room. (*Id.*). Nehme also testified that during the exam he would look up at the proctor, Innah Lachica, to express his frustration but the proctor did not do anything. (*Id.*).

Lachica, the exam proctor who was an eyewitness, confirmed in her deposition Nehme's account of what occurred, testifying to the numerous distractions both inside and outside room AHC2 495 the day Nehme took the

exam. (R. 64 ¶ 43.  Lachica confirmed that the room was not the preferred room for accommodations because of its location near a large conference room, stairs, and an elevator, and because of the room's "freezing cold" temperature, and she agreed that no student should have been assigned to the room as a minimal distraction room on the date in question given the other events that were scheduled to take place outside the room. (*Id*.).  Lachica further testified that the room had a large translucent window that had gaps through which one could see into the hallway. (*Id*.).  Lachica testified that one could see the shapes and shadows of people through this window and could hear the noise of people talking loudly in the hallway as they walked by. (*Id*.).  She also testified that there was lots of noise and movement distractions during the exam to the point that even she, a non-disabled person, was distracted. (*Id*.).  She observed and experienced both auditory and visual distractions, which included groups and crowds of people, as often as every 15 minutes, passing by talking loudly over each other and at the same time. (*Id*.).  Lachica also stated that, although she put a sign on the door for people to be quiet, the sign was ignored. (*Id*.).  Lachica further confirmed that the room was "freezing cold", that she believed the temperature was a distraction to Nehme, and that she ordered a heater be brought into the room, which involved the added distraction of its setup. (*Id*.).  Lachica also testified to an additional, significant auditory distraction during the exam:  a loudspeaker in the outside hallway that

repeatedly announced when students could return to their OSCE simulation rooms. (*Id.*). Although Lachica was aware of these numerous distractions, and although she had both the authority and responsibility to tell those in the hallway to be quiet, to stop the exam, and to request a room change – which she acknowledged she could have done -- she chose to do nothing except acquire the room heater. (*Id.*). Lachica's only excuse for not taking action to help Nehme was because she was "afraid" it would cause even more distractions, even though she could have notified her boss, Maritere Williams, about the situation as she had done with the room temperature situation. (*Id.*).

Further record evidence to support the fact that room AHC2 495 was not a proper minimal distraction room for Nehme's retake of the Psychiatry shelf exam can be found in the many memorialized witness statements in the FIU IDEA's investigative reports, which concluded that Nehme had not been properly accommodated. The IDEA reports memorialized statements made to IDEA investigator Valerie Hall by Teresa Reyes-Gavilan, the person who assigned Nehme to room AHC2 495, who was fully aware of the many student events and their potential distractions occurring directly outside the room during the exam, and whose conflicting deposition and affidavit testimony FIU touts as conclusive that FIU had properly accommodated Nehme during the exam. (R. 64 ¶¶ 22, 23; R. 63-1 pp. 32, 65-66). Although her deposition testimony fluctuated wildly, Reyes-

Gavilan testified that there were at least six, and as much as eight, rooms that the medical school used as minimal distraction rooms. (R. 64 ¶ 22).[3]  Reyes-Gavilan also informed investigator Hall that, at the time Nehme was scheduled for the Psychiatry exam retake in room AHC2 495, there were several meetings in other conference rooms and three OSCE  simulation rooms near room AHC2 495, with each meeting having 20 participants. (R. 64 ¶ 23; R. 63-1 pp. 32, 65-66). Significantly, although she denied doing this in her deposition, Reyes-Gavilan also informed Hall – who confirmed that Reyes-Gavilan's statements made to her as set forth in the IDEA reports were accurate – "that no student should have been assigned to take a test in AHC2 495 because of the amount of people on that floor." (*Id*.).  Reyes-Gavilan further informed investigator Hall that "she normally catches these situations and understands that a student may have felt uncomfortable with the arrangement." (*Id*.).  Reyes-Gavilan admitted in her deposition that it was her responsibility to know what other events were going on around the rooms assigned as minimal distraction rooms. (R. 64 ¶ 23).  In this regard, Hall in her deposition testified that Reyes-Gavilan, as the room scheduler, should have had knowledge of what the conditions were around AHC2 495 on the day in question,

---

[3] This directly conflicts with FIU's inaccurate statement in its recitation of the facts in its Answer Brief that there were only two rooms that the medical school used as minimal distraction rooms. *See* Answer Brief p. 11.

and that Reyes-Gavilan should have taken action to change the room for Nehme. (*Id*.).

In addition to this record evidence, which alone raises triable issues of fact to support a finding that Nehme was not properly accommodated when he retook the Psychiatry shelf exam, this Court cannot overlook the fact that the IDEA, FIU's own discrimination investigative arm, concluded after a thorough investigation that the medical school had failed to provide Nehme with the required accommodation of a minimal distraction room and that this failure "impacted his ability to concentrate while taking the … exam." (R. 64 ¶¶ 45, 46, 50). FIU tries to argue around this damning evidence by citing to caselaw that it is improper for a court to accept any legal analysis or legal conclusions in an internal investigative report. However, FIU's argument misses the point. Neither Nehme argued below nor did the Magistrate Judge adopt as the law the IDEA's legal analyses in its investigative report as being conclusive and binding on FIU as a matter of law. Rather, the position Nehme took and with which the Magistrate Judge agreed is that the IDEA reports' factual findings and conclusions that Nehme had not been placed in a proper minimal distraction room can be considered evidentiary admissions by FIU that the room was not a proper minimal distraction room, that FIU failed to accommodate Nehme as it was required to do, and that this failure negatively impacted Nehme's performance on the Psychiatry shelf exam retake. *See Williams*

*v. Asplundh Tree Expert Co.,* No. 3:05–cv–479–J–33MCR, 2006 WL 2868923 at
*5 (M.D. Fla. Oct. 6, 2006) (granting plaintiff's motion for summary judgment and
recognizing that company's internal investigative report findings of discrimination
can be introduced into evidence by plaintiff as admissions of party-opponent under
Fed. R. Evid. 801); *Georgia Power Co. v. ABB, Inc.*, NO. 4:17-CV-00125-HLM,
2019 WL 11505721 at *5, n.1 (N.D. Ga. Feb. 27, 2019) (relying on *Williams* to
recognize that company's internal incident report finding failure to follow safety
procedures was an admission of party opponent under Fed. R. Evid. 801); *Ray v.
Ford Motor Co.*, No. 3:07CV175-WHA-TFM, 2011 WL 6749034, at *3 (M.D.
Ala. Dec. 23, 2011) (finding an internal report to be an admission because "[it] was
created by [the company]'s agents and contains evidence contrary to [the
company]'s position at trial").

　　All this record evidence – which FIU either completely ignores or
downplays in its Answer Brief – demonstrates that, at the very least, triable issues
of material fact exist as to Nehme's failure to accommodate claim in Count I of the
Amended Complaint, which should have survived summary judgment. The
Magistrate Judge correctly ruled as such and the District Judge should have
adopted that finding by denying FIU's motion for summary judgment.

　　As for FIU's novel "interactive process" argument in its Answer Brief,
which the Magistrate Judge had correctly rejected in her Report and

Recommendation, Nehme stands on his legal arguments raised in his Initial Brief. (Initial Brief pp. 38-39). Notably, the cases FIU cites to support its waiver-like position are inapposite. The first case cited, *Bowens-Thomas v. Alabama Coop. Extension Sys.*, No. 2:16-CV-621-WKW, 2022 WL 617184, at *8 (M.D. Ala. Mar. 2, 2022), was an employment case where the summary judgment in the defendant's favor was not, as FIU represents, granted because the plaintiff had failed to let the defendant know that a provided accommodation was "ineffective". Rather, summary judgment was granted for two reasons: (1) because the plaintiff had failed to establish that he had a qualifying disability for purposes of the ADA; and (2) because the plaintiff's request for an accommodation had come at the last minute and thus was not reasonable as a matter of law. 2022 WL 617184 at *7-8. The second case FIU cites -- *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278 (11th Cir. 1997) – is another employment case that simply recognized that the "interactive process" under the ADA is an informal process through which an employer and employee engage in discussions to come up with a reasonable accommodation in the first place. 117 F.3d at 1286. The case has no discussion of a disabled person forever waiving a failure to accommodate claim by not immediately or contemporaneously notifying the accommodation provider that

an already agreed upon and required accommodation was not being provided at the time it should be provided.[4]

FIU also seems to cite as authority for its "interactive process" waiver argument this Court's decision in *Forbes v. St. Thomas University, Inc.*, supra. However, as discussed above, *Forbes* is factually distinguishable. Unlike the student in *Forbes*, Nehme's dismissal decision here was not yet final and was still subject to appeal when he raised the failure to accommodate issue and internally complained to the IDEA about it. The student in *Forbes*, in contrast, had already

---

[4] FIU also cites in footnote 3 of its Answer Brief to a plethora of cases involving students who did not complain or raise concerns about not being accommodated until after they received negative grades and where the courts granted summary judgment to the defendants. However, these cases are all factually and legally distinguishable in that none of them involved a situation, as here, where the student had been approved for a particular accommodation and the accommodation then was not provided. *See, Oser v. Capital University Law School*, 2009 WL 2913919, at *9-11 (S.D. Ohio 2009) (plaintiff complained he had not received an **additional** accommodation over and above one that the school had approved and had fully provided); *Frank v. University of Toledo*, 621 F. Supp. 2d 475, 487-88 (N.D. Ohio 2007) (plaintiff complained about not receiving accommodations after failing exam where school had not previously received any request from student for specific accommodations nor had it approved any accommodations); *Hoppe v. College of Notre Dame of Maryland*, 835 F. Supp. 2d 26 (D. Md. 2011) (no record evidence that plaintiff was subjected to any distractions during the exam such that school had not properly accommodated him); *Martin v. Southern Illinois University School of Medicine*, No. 16–CV–3294, 2017 WL 4780613 (C.D. Ill. Oct. 23, 2017) (plaintiff had received all testing accommodations he had sought, was specifically asked by faculty who checked on him during the exam if he had any questions to which he did not respond, and his post-exam complaint about not being placed in sufficiently quiet room was unsupported and not reasonable).

been dismissed from the school for not meeting the required grade point average for advancement and was seeking readmission when she first raised the failure to accommodate issue, claiming as an accommodation one that had never been awarded her. 456 Fed. Appx. at 812. In addition, the student in *Forbes*, unlike Nehme, did not have her failure to accommodate claim internally found substantiated by the university either before the final dismissal decision was handed down or after the dismissal when she sought readmission.

The Magistrate Judge's recommendation that summary judgment should be denied as to Count I of the Amended Complaint thus was correct, and the District Judge erred in failing to adopt that recommendation.

**B.** ***There were genuine issues of material fact that FIU acted with deliberate indifference in both failing to accommodate Nehme for his Psychiatry exam retake and in ultimately dismissing him.***

First, as to Nehme's failure to accommodate claim, FIU argues that it is appropriate for this Court to ignore room scheduler Theresa Reyes-Gavilan's conflicting statements, between her deposition testimony and what she told IDEA investigator Hall, regarding the placement of Nehme in what was obviously an improper minimal distraction room, AHC2 495, for Nehme's retake of the Psychiatry shelf exam. FIU also wishes for this Court to ignore the testimony of Innah Lachica, the exam proctor, as to her responsibilities and failure to abide by them when Nehme was exposed to the many room distractions while retaking the

final exam. Furthermore, FIU would like this Court to ignore the other record evidence of a woeful lack of proper training of those individuals responsible for the provision of proper testing accommodations to students, such as Nehme, with learning disabilities who required accommodation. However, FIU's position that this Court should make credibility determinations and view the facts and evidence solely in its favor would be improper at the summary judgment stage.

Nehme presented record evidence, to be viewed in his favor, that the medical school officials in charge of assigning him to a minimal distraction room for the retake of the Psychiatry shelf exam assigned him to a room that should not have been used as a minimal distraction room. (R. 64 ¶¶ 23, 28, 42, 43). Reyes-Gavilan, the scheduler, had knowledge of all the many events that were scheduled to take place in the vicinity of room AHC2 495 on the date of the exam, events that entailed heavy foot traffic in the area, and she informed the IDEA in its internal investigation that "no student should have been assigned to take a test in AHC2 495 because of the amount of people on that floor." (R. 64 ¶ 23). Hall, the IDEA investigator who interviewed Reyes-Gavilan, testified that Reyes-Gavilan should have had knowledge of what the conditions were around AHC2 495 on the day of the exam and should have taken action to change the room for Nehme. (*Id.*).

In addition, Lachica, the exam proctor, admitted in her deposition that she had the authority to stop the exam and request a room change if she experienced

significant room distractions. (R. 64 ¶¶ 29, 43). She also admitted that she had the authority and responsibility in the event of noisy conditions occurring outside the exam room to physically get up and ask those making the noise to quiet down. (*Id.*). However, Lachica deliberately and knowingly chose to shirk these important responsibilities and to do nothing, claiming that she was "afraid" of further distracting Nehme. (*Id.*). Although FIU again takes the position that Lachica had no knowledge of the distractions in the room because she was not expressly made aware of the distractions by Nehme, this position is contradicted by Lachica's testimony that she was, throughout the exam, well aware of the many distractions Nehme was exposed to and chose to do nothing because she did not want to further distract Nehme. (*Id.*). Thus, both Reyes-Gavilan and Lachica were school officials who had the authority and ability to correct the clear failure to properly accommodate Nehme for his Psychiatry retake exam yet chose to act deliberately with regard to Nehme's disability by taking no corrective action whatsoever when they could and should have.

Notwithstanding this record evidence in Nehme's favor that school officials with the authority to act and failed to do so in the face of knowledge of adverse conditions, FIU argues that neither Reyes-Gavilan nor Lachica legally qualify as medical school "officials" for purposes of the "deliberate indifference" standard. However, to the extent that they were not sufficiently high in the medical school

hierarchy to be deemed such "officials", Nehme still presented substantial record evidence that the medical school was "willfully blind" in its attention to and implementation of reasonable accommodations for its disabled students, such as Nehme. FIU's IDEA, through its investigation and in its initial report findings, uncovered numerous long-running, systemic problems with the medical school's provision of testing accommodations to its disabled students and its administrators' complicity therein. (R. 64 ¶¶ 48, 51). In addition, record evidence was presented that the medical school failed to properly train those employees who had the authority to implement the testing accommodations and who did not have knowledge as to what constituted a minimal distraction room, including, most notably, Dean Adrian Jones, Lachica, and Reyes-Gavilan's immediate supervisor, Maritere Williams. (R. 64 ¶ 51). As the Eleventh Circuit and district courts within it have recognized, blind delegation of "complete discretion to the staff" who are not properly given guidance in the ADA and accommodations requirements can rise to the level of "willful blindness" that is comparable to deliberate indifference for purposes of ADA compensatory damage claims. *Liese v. Indian River Cnty. Hosp. Dist.,* 701 F.3d 334, 351 (11th Cir. 2012); *Segev v. Lynn Univ., Inc.*, No. 19-CV-81252-Cannon/Reinhart, 2021 WL 2269838 at *13 (S.D. Fla. Feb. 6, 2021) (denying summary judgment as to intentional discrimination claim based on "willful blindness").

As to Plaintiff's discriminatory dismissal claim, FIU argues that "there was no way to determine whether Plaintiff's failure of the Psychiatry shelf exam retake was, *in fact*, a result of his placement in AHC2 495." (Answer Brief p. 45). While this may be true in the abstract, Nehme presented evidence – most notably in the directly conflicting testimonies of deciding official Dr. Elizabeth Bejar on one hand and IDEA Director Shirlyon McWhorter and its investigator Hall on the other -- that Dr. Bejar, in ultimately denying Nehme's appeal, deliberately ignored the IDEA's detailed written report findings that Nehme was not reasonably accommodated with a proper minimal distraction room and that this failure adversely impacted his academic performance. (R. 64 ¶¶ 39, 50). Dr. Bejar further testified falsely in deposition when she repeatedly claimed that the IDEA had not specifically found in either of its reports that Nehme's failure to be accommodated for his exam retake adversely impacted his performance on the exam, when the reports and the testimonies of McWhorter and Hall unequivocally stated otherwise. (R. 64 ¶ 50). Evidence thus was presented that Dr. Bejar's written conclusion in her denial of Nehme's appeal, to the effect that there was "no indication" that his upheld discrimination allegations had "an adverse impact" upon his academic performance, was false and inaccurate. (*Id.*).

In sum, genuine, triable issues of material fact exist, based on the record evidence, that the medical school and its officials authorized to take remedial

action acted with deliberate indifference in both denying Nehme his testing accommodation for the Psychiatry shelf exam retake and in ultimately dismissing him from the school.  The Magistrate Judge correctly recommended that summary judgment as to Nehme's claim for compensatory damages should be denied, and the District Judge should have adopted that recommendation.

## CONCLUSION

Based on the foregoing and the arguments in Nehme's Initial Brief, the District Court's decision granting FIU's motion for summary judgment should be reversed, and the case remanded for further proceedings, including a trial.

Respectfully submitted,

RODERICK V. HANNAH, ESQ., P.A.
Attorneys for Plaintiff-Appellant
4800 North Hiatus Road
Telephone:  (954) 362-3800
Facsimile:   (954) 362-3779
Email:  rhannah@rhannahlaw.com

By___/s/ *Roderick V. Hannah*___
Roderick V. Hannah
Fla. Bar No. 435384

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because:

    1.

    [**X**]  this brief contains **6,482** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

    [_]  this brief uses a monospaced typeface and contains [_____] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [**X**]  this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 for Windows with Times New Roman 14-point typeface, or

    [_]  this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

(s) _____*/s/ Roderick V. Hannah*_____
      RODERICK V. HANNAH

Attorney for Appellant ELIE NEHME

Dated: June 1, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: ___*s/ Roderick V. Hannah*___
       Roderick V. Hannah
       Florida Bar No. 435384

**SERVICE LIST**
*Nehme v. Florida International University Board of Trustees*
**CASE NO. 22-13945-B**

Lourdes E. Wydler, Esq.
Lauren D. Martin, Esq.
WYDLER LAW
2600 Douglas Road, PH-4
Coral Gables, FL  33134
(305) 446-5528
[lew@wydlerlaw.com](mailto:lew@wydlerlaw.com)
[ldm@wydlerlaw.com](mailto:ldm@wydlerlaw.com)

*Attorneys for Appellee*
*FLORIDA INTERNATIONAL UNIVERSITY*
*BOARD OF TRUSTEES*